IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRONE HARPER, | : | Case No. 4:13-CV-02811 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | (Magistrate Judge Cohn) |
| | : | |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | |
| SOCIAL SECURITY | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**
March 24, 2015

Before the Court is the Report and Recommendation of Magistrate Judge Gerald B. Cohn recommending that the Court affirm the Social Security Commissioner's decision denying Plaintiff disability insurance benefits and Plaintiff's objections thereto. ECF Nos. 20,21. After a thorough examination of the record, and for the reasons that follow, the Administrative Law Judge ("ALJ") did not base his decision on substantial evidence. Therefore, the case is remanded to the Commissioner for further proceedings.

1

## I. PROCEDURAL HISTORY

On February 24, 2011, Plaintiff, ("Harper"), filed an application for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") alleging disability, beginning June 2010 as a result of mental impairments. Tr. 160-69. Benefits were initially denied.  Harper then requested and was granted an administrative hearing.  On May 25, 2012, Harper appeared before the ALJ where Harper, who was represented by counsel, his wife, and a vocational expert testified.  Tr. 103-34.  The ALJ, using the sequential evaluation process for disability, issued an unfavorable decision. Tr. 21-37.  On September 9, 2013, the Appeals Council denied Harper's request for review making the ALJ's findings the final decision of the Commissioner. Tr. 1-7, 19-20.

On November 18, 2013, Harper appealed the final decision to this Court and the case was referred to Magistrate Judge Cohn.  The Magistrate Judge issued his Report and Recommendations on February 12, 2015 and concluded that the ALJ's decision was supported by substantial evidence.  ECF No. 20.  He recommended that the Court deny Harper's appeal and affirm the decision of the Commission. ECF No. 20.  Harper filed objections on March 2, 2015.  ECF No. 21.

## II. FACTUAL BACKGROUND

Harper attended the Wyoming Valley Alcohol and Drug (WVADS) Services Inc. from September 2009 to June 2010. Tr. 342.  On June 9, 2010, Harper presented to the emergency room at Wyoming Valley Healthcare complaining of suicidal thoughts, with a plan to jump off a bridge and thoughts of killing his wife and her alleged lover.  Tr. 299.  At the time of his admission, he was alert and oriented, his memory was "normal", and his affect was "flat." Tr. 300-01.  Harper was then given a psychiatric evaluation. Tr. 304.  His mental status exam indicated that he was alert, oriented, neat with good hygiene and  had appropriate psychomotor activity.  Tr. 305.  His mood was depressed and anxious, he denied hallucinations and delusions, his memory and recall were fair, and his insight and judgment were poor.  Tr. 307.

Harper was diagnosed with bipolar disorder and was recommended for transfer to a psychiatric hospital. Tr. 309.   Later that day, Harper was transferred to First Hospital Wyoming Valley.  *Id.*  On admission, he was alert and oriented with depressed mood, impaired insight/judgment, and poor impulse control.  Tr. 311.

On November 4, 2010, Harper was transferred to Clarks Summit State Hospital ("Clarks Summit") for depression. Tr. 324.  Upon his admission at this

3

facility, it was recorded that he no longer had suicidal or homicidal ideation.  Tr. 324.  Also, he had no recent history of assaultive or aggressive behavior, but was described as becoming agitated at times. Tr. 324.  His mental status examination indicated that he was mostly cooperative but was "somewhat slightly guarded with limited eye contact." Tr. 325.  His thought content "revealed no overt delusions" and "there were no reported hallucination." Tr. 325.  His intellectual level appeared to be low average, his insight and judgment were limited, and his impulse control seemed fair. Tr. 325.  He was assigned a GAF score of 40. Tr. 328.

Doctors found that Harper's condition was improving and he was compliant with his medication and treatment.  Tr. 339.   Certain stressors, for example, his wife's incarceration, had been alleviated since her release from custody.  Tr. 339.  Harper was discharged on January 19, 2011 with a diagnosis of " Major Depression, Single Episode" and given a GAF score of 70.  Tr. 328.  At the time, he denied suicidal or homicidal ideation and reported no hallucinations. Tr. 327.

On February 18, 2011, Harper was evaluated at the Community Counseling Service ("Community Counseling").  Tr. 372.  He reported that he had been released from Clarks Summit after being treated for depression. Tr. 372.  He stated that he was hearing voices, but not hearing them at the present time, and denied suicidal or homicidal ideation.  Tr. 372.  On examination, his mood and affect were

"bright", his behavior was "controlled", his appearance was" neat", his insight was "fair" and his judgment was "questionable".   Tr. 372.   He was diagnosed with schizoaffective disorder and borderline mental retardation.   Tr. 372.   A physician note from the same date, however, indicated that Harper denied experiencing any delusions and hallucinations.  Tr. 378.   He was prescribed Celexa, Seroquel, Cogentin, and Lithium. Tr. 373.

On February 24, 2011, Harper applied for DIB and SSI. Tr. 160-69.   He submitted a Function Report where he reported problems sleeping, dressing, bathing, caring for his hair, and shaving. Tr. 277.   He explained that he "sometimes needs to be told to shower" and that his wife has to shave him because he cannot concentrate.  Tr. 277.   He reported that he needed reminders from his wife to take his medication and to take care of himself.  Tr. 277.   He also claimed that he went outside " very rarely" because he is "paranoid, confused, anxious, and cannot be around a lot of people." Tr. 279.   He reported "seeing things that aren't there, and problems with concentration, memory, understanding, distraction and confusion." Tr. 281.   He also reported having problems handling stress and changes in routine. Tr. 282.  Harper's wife also submitted a Function Report, which indicated the same limitations as Harper's Function Report.   Tr. 267-74.   She explained that she

"noticed a substantial change in his mood and that he complained of auditory and visual hallucinations." Tr. 274.

On March 22, 2011, Harper reported increased hostility and hallucinations to doctors at the Community Counseling. Tr. 379. The doctor's notes indicated that Harper's hallucinations were not "24/7 but seemed 'more frequent.'" Tr. 379. The notes revealed that Harper's schizoaffective disorder was worsening and his Seroquel dosage was increased. Tr. 379. Doctors also encouraged compliance with his medication. Tr. 379.

On Harper's subsequent visit to Community Counseling on April 15, 2011, he again reported experiencing occasional non-commanding auditory hallucinations. Tr 380. Harper was compliant with his medication and he reported "no anxiety" but "poor concentration." Tr. 380. He had mild psychomotor retardation, blunted and inattentive affect, and a neutral mood. Tr. 380.

On May 13, 2011, at his next Community Counseling appointment, Harper reported irritability, occasional visual hallucinations such as seeing shadow and lights, but no auditory hallucination. Tr. 381. He was alert and oriented, clean, "argumentative but fairly cooperative," had blunted affect, irritable mood, and poor insight/judgment. Tr. 381. Harper told his physicians that he was not complaint with his medication and had been missing doses. Tr. 381.

6

On May 26, 2011, Harper had a consultative exam with  a state agency psychologist,  Dr. Sara Cornell, Psy. D.  Tr. 391.  He reported that his depression began in 2008 and his symptoms included sadness, crying, fatigue, and social isolation.   Tr. 389.  He stated that he had no friends, experienced irritability and preferred to stay away from public places and people due to this irritability and mood swings.  Tr. 389.  Harper reported experiencing hallucinations, voices telling him what to do and seeing things, like mice or shapeless objects running across the floor of his house.   Tr.390.   Dr. Cornell noted that Harper exhibited "no tics, repetitive, stereotypical or odd movements, made fair eye contact, and had fair social skills." Tr. 391.   Harper had difficulty providing examples as to the likely outcomes of his behaviors or what he would do in various imaginary situations and could not perform tests of counting and seriation such as counting backwards from 100 by 7s.  Tr. 391.

Harper was "appropriately dressed and groomed," his hygiene was "fair" and he was "polite, pleasant and cooperative."  Tr. 389.   He was alert and oriented with spontaneous, clear, coherent and logical speech "but with some evidence of a formal thought disorder." Tr. 389.  His thought process was "mostly relevant and goal-directed," and he "exhibited good attention and concentration." Tr. 389. Harper reported symptoms of depression, irritability, mood swings, aggression,

panic attacks and paranoia.  Tr. 389.  He also informed Dr. Cornell that he only felt safe at his home.  Tr. 390.

Dr. Cornell diagnosed him with "bipolar disorder, most recent episode depressed, severe with psychotic features," "panic disorder with agoraphobia," "social anxiety," and antisocial personality disorder.  Tr. 391.  She assigned him a GAF score of 45[1].  Tr. 391.  Dr. Cornell opined that Harper had moderate limitations in understanding, remembering and carrying out instructions and interacting appropriately with the public, supervisors, and co-workers.  Tr. 387. She also opined that Harper had marked limitations in his ability to make judgments on simple work related decisions, respond appropriately to work pressures, and to respond appropriately to changes in the work setting.  Tr. 387.

On June 10, 2011, Harper followed up at Community Counseling and reported increased irritability, occasional agitation and occasional auditory hallucinations.  Tr. 376.  Upon examination, he was found to be alert, clean, and cooperative.  Tr. 376.  His affect was flat/argumentative and his mood was mildly anxious. Tr. 376.  His "memory/intelligence" was "intact with mild mental retardation" and his "insight/judgment" was poor. Tr. 376.

---

[1] The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders,* (DSM–IV–R) (4th ed.2000). A score between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *Id.*

8

On June 21, 2011, Dr. James Vizza, Psy. D, a non-examining state agency psychologist, reviewed Harper's file including Dr. Cornell's consultative exam. Tr. 106.  He opined that Harper's statements were only "partially credible" based on the record. Tr. 106.  He opined that Harper had a moderate limitation in activities of daily living, social functioning, and maintaining concentration, persistence or pace. Tr. 107.  He concluded that Harper "can perform simple routine, repetitive work in a stable environment." Tr. 109.

Harper visited Community Counseling again in August 2011, November 2011, January 2012, and March, 2012.  At each of these visits, he complained of non-commanding auditory hallucinations, racing thoughts and was diagnosed as schizoaffective and  with borderline mental retardation. Tr. 406-11.  His mood was assessed as neutral and his affect as flat or blunted during his visits.  *Id.*  During his March 15, 2012 visit with Community Counseling doctors, Harper continued to complain of occasional non-commanding auditory hallucinations. Tr. 406.  He also complained of mood liability and of racing thoughts.  *Id.*  He denied paranoia or delusions and he reported that his anxiety was controlled.  *Id.*  His insight and judgment were poor and his thought process was rambling but still coherent. Tr. 407.

On his last visit with Community Counseling on May 11, 2012, prior to his ALJ hearing, Harper told clinicians that he wanted an appointment every month. Tr. 403-04.  His wife indicated that he has been "shaking a lot, had blurred vision, was dropping things and experiencing some memory loss."  Tr. 403.  She also stated that Harper was irritable, was isolating himself and hated crowds. *Id*.  He denied having hallucinations or delusions and his judgment, memory and insight were described as "poor." *Id.*

Harper also began seeing Dr. Cornell for treatment on a monthly basis from January 25, 2012.  During their first session, she discussed Harper's difficulty in coping with depression and coping techniques Harper could use to help lessen his depression. Tr. 398.  Dr. Cornell noted that Harper "presented well and in good spirits."  Tr. 398.  His next session was on February 18, 2012 and there, Dr. Cornell observed that Harper presented well and in good spirits. Tr. 397.  Harper was hoping to use an upcoming income tax return to get an apartment with his wife, and "state[d] that perhaps [his] wife could resume working, although he was encouraged to discuss [with] his wife rather than assume she would support them." *Id*.  Harper reported that he had less anger and frustration and he was spending most of his time watching TV and sleeping. *Id*.  His next appointment was on March 7, 2012.  Again, Dr. Cornell observed that Harper presented well and in

good spirits.  Tr. 396.  He reported that he had been more productive since his last visit. *Id.*

On April 11, 2012, Harper had a follow up session with Dr. Cornell where he  reported constant depression. Tr. 395.  Dr. Cornell observed that he "presented well but stated continued thoughts on disability hearing." *Id*.  Harper stated that "he was banking on being approved for SSD." *Id*.   Harper also told Dr. Cornell that" he did not want to think about having to work and has been his encouraging wife to work but she refuses unless he will." *Id*.  Harper noted that "he does not want to 'mess up' disability claim 'by working as well as past difficulty due to his poor coping skills.'" *Id.*

On May 16, 2012, Dr. Cornell completed a medical source statement. Tr. 399-400.  She opined that Harper had a  "poor to no" ability to remember work-like procedures, maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances.  *Id.* She also opined that Harper would have "poor to no" ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 399.  Finally, she also indicated that Harper generally had a "poor to no" ability to do semiskilled or skilled work, to interact

11

appropriately with the general public, to travel in unfamiliar areas, and to use public transportation. *Id*.  She also concluded that  Harper would miss three or more days of work per month due to his mental impairment.  Tr. 399.


## III. STANDARD OF REVIEW

District judges have wide discretion on how they choose to treat reports and recommendations from magistrate judges.  *See United States v. Raddatz,* 447 U.S. 667, 680, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).  "Whether or not objections are made to the magistrate's report, under § 636(b)(1) (C) the district court 'may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate."  *Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir. 1987), *cert denied,* 484 U.S. 837, 108 S.Ct. 120, 98 L.Ed.2d 79 (1987).  When objections are filed, the Court must conduct a de novo review of the portions of the Report and Recommendation to which the parties object. 28 U.S.C. § 636(b)(1) (C).  *See also, Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

While the Court may conduct a de novo review of the Magistrate Judge's Report and Recommendation, it does not conduct a de novo review of the ALJ's determination to deny benefits.  *Hunter Douglas, Inc. v. NLRB,* 804 F.2d 808, 812 (3d Cir. 1986).  Rather, on appeal of a denial of Social Security benefits, the Court

merely ensures that the ALJ's decision is supported by substantial evidence in the record. *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005); *Adorno v. Shalala,* 40 F.3d 43, 46 (3d Cir. 1994). "Substantial evidence" is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 407, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Jesurum v. Secretary of the United States Dep't of Health & Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995). Such evidence may be less than a preponderance, *Richardson,* 402 U.S. at 401; *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir. 1979), but "must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's findings." *Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1190-91 (3d Cir. 1986) (*quoting* R. Pierce, S. Shapiro & P. Verkuil, Administrative Law and Process 358-59 (1985)). If the ALJ's findings of fact are supported by substantial evidence, the Court is bound by those findings. *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001).

## IV. DISCUSSION

Harper objects to the ALJ's findings on several grounds. First, he contends that the ALJ did not give proper weight to the treating psychologist's opinion. Second, he contends that the ALJ failed to present all of Harper's limitations to the

13

vocational expert in his hypothetical question.   Third, he argues that ALJ improperly discounted the credibility of Harper and that of Harper's wife.

### a. Substantial evidence does not support the ALJ's finding that the treating psychologist's opinions were entitled to little weight.

Harper argues that the ALJ erred by failing to give controlling weight to his treating psychologist.  As a general rule, "treating physicians' report should be accorded great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (*quoting Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)); 20 C.F.R. § 404.1527(d)(2) (controlling weight is appropriate where treating physician opinion is well-supported by medical evidence and consistent with other substantial evidence in the record).  If, however, a treating physician's opinion  conflicts with other medical evidence, the ALJ is free to give that opinion less- than-controlling weight or even reject it, so long as the ALJ clearly explains his reasons and makes a clear record.  *See Horst v. Comm'r of Soc. Sec.,* 551 F. App'x 41, 45 ( 3d Cir. 2014) ("[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper")( *quoting Cotter v. Harris,* 642, F.2d 700, 706-07 (3d Cir. 1981)) (internal quotation marks omitted)).  An ALJ may not reject medical

14

determinations by substituting his own credibility judgment, speculation or lay opinion. *Plummer,* 186 F.3d at 429; *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988); *Morales* 225 F.3d at 317-18.

Here, the ALJ explained that he gave little weight to Dr. Cornell's medical source statement and statements in the medical opinion and to the GAF score of 45 because they were inconsistent with Dr. Cornell's own observations of the patient. Tr. 31. In that vein, the ALJ noted that Dr. Cornell's examination revealed that Harper was cooperative, his speech was spontaneous, clear, coherent and logical and that he was of average intelligence. *Id.*

However, Harper's ability to cooperate with a medical examiner in a safe, controlled environment does not necessarily contradict Dr. Cornell's conclusion that he suffered from antisocial personality disorder and social anxiety, both of which would be exacerbated in most workplace situations. As the United States Court of Appeals for the Third Circuit has noted, "[f]or a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Morales*, 225 F.3d at 319. Thus, observations made during a clinical visit do not necessarily correlate to an individual's ability to function in a work setting.

Nor do any of the findings cited to by the ALJ contradict Dr. Cornell's conclusion that Harper would have marked difficulties responding to work pressures or changes in a work setting. Harper's ability to speak without difficulty and cooperate with Dr. Cornell likewise does not contradict a conclusion that he would have difficulties make judgments on simple work-related decisions.

Furthermore, the ALJ failed to consider from that Dr. Cornell's report, that Harper was experiencing paranoia, hallucinations, and symptoms of anxiety, particularly in social situations. All of these symptoms could contribute to difficulty in a work setting, and conceivably contributed to Dr. Cornell's opinion. Dr. Cornell's GAF score of 45, further supports her opinion that Harper suffered from severe limitations. The ALJ gave short shrift to this GAF score because it is not capable of empirical verification and represents a "personalized one time snapshot" assessment of the medical provider." Tr. 32. Be that as it may, it does not contradict the fact that Dr. Cornell was consistent in her belief that Harper suffered from severe limitations.

The examination findings that the ALJ believed contradicted Dr. Cornell's medical opinion bear even less weight when applied to Dr. Cornell's May 2012 opinion, rendered at a time when she was Harper's treating physician. Tr. 399-400. Dr. Cornell's May 2012 opinion was internally consistent, and was consistent

with her previous opinion, albeit more detailed and slightly more limiting. *Id*. Dr. Cornell reiterated that Harper had a poor ability to make judgments simple work-related decisions, but further noted that he would have significant difficulty maintaining attendance at work. *Id*.

Dr. Cornell's opinion was supported by Harper's severe depressive symptoms, mood swings, consistent and sustained auditory and visual hallucinations, as well as Harper's social anxiety. Tr. 399. This May 2012 opinion should have been given more weight as it was rendered after Dr. Cornell began treating Harper. However, the ALJ rejected this opinion for the same less than adequate reasons provided for rejecting the earlier consultative examination opinion. In short, the ALJ failed to provide sufficient reasoning to deny Dr. Cornell's opinion controlling or significant weight.

Further compounding this error, the ALJ elected to reject all available medical opinions in favor of reaching his own lay conclusion regarding Harper's mental limitations. Tr. 31-32. In addition to giving little weight to the treating physician opinion of Dr. Cornell, the ALJ concluded that the State Agency psychological consultant's opinion was only entitled to "[s]ome weight" because

"after seeing and hearing the claimant . . . [the ALJ] finds that the claimant is not as limited as the non-examining, non-consulting psychologist has opined."[2]  Tr. 32.

The ALJ's decision to reject the severity of all available medical opinions in favor of reaching his own conclusion is nothing more than substituting lay opinion for that of an expert's opinion, behavior that the Third Circuit has repeatedly warned against.  *See*, *Plummer,* 186 F.3d at 429; *Bowen,* 861 F.2d at 408; *Morales,* 225 F.3d at 317-18.  The principle against an ALJ substituting his or her own lay opinion for that of an expert "is especially profound in a case involving a mental disability, [where] an ALJ's personal observations of the claimant 'carry little weight[.]'"  *Morales*, 225 F.3d at 319 (*quoting Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)).  Consequently, the ALJ did not properly evaluate the medical opinions  presented in this case;  remand is necessary for proper consideration of these opinions.

### b.  The ALJ's adverse credibility determination was improper

Next, Harper argues that the ALJ discounted Harper's credibility and improperly found Harper's wife, Michele, to be less than credible.

---

[2] This Court recognizes that Dr. Vizza's opinion did not render Harper per se disabled.  Tr. 106.  However, in order for this opinion to support the ALJ's ultimate conclusion at Step Five, at the very least the ALJ would have been required to pose hypothetical questions to the vocational expert that reflected the limitations imposed by Dr. Vizza. Given the ALJ's failure to do so, it cannot be said that Dr. Vizza's opinion supported the ALJ's determination.

The Third Circuit has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Comm'r of Soc. Sec.,* 440 F. App'x 252, 253 (3d Cir. 2012). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel,* Civ. A. No. 00–1309, 2001 WL 793305, at *3 (E.D.Pa. July 11, 2001) (citing *Van Horn v. Schwieker,* 717 F.2d 871, 873 (3d Cir. 1983)). When evaluating the credibility of the parties involved, the ALJ must indicate which evidence he rejects and which he relies upon as a basis for his findings. *See Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F. 3d 429, 433 (3d Cir. 1999).

Here, the ALJ determined that Harper is not credible because "after reviewing the entire medical evidence of record, the claimant's isolation and struggles with activities of daily living are an attempt to bolster a disability claim." (R. 32). The ALJ points to comments made by Harper to Dr. Cornell on April 11, 2012. Harper, at the time, stated that "he was banking on being approved for disability benefits, "did not want to think about having to work, and did not want to "mess up" his disability claim by working, and "because of his past difficulty maintaining employment due to poor coping skills." Tr. 395. While this statement indicates that perhaps Harper did not want to work because he would rather simply

19

obtain disability benefits, it also indicates Harper's unsuccessful past attempts at work.  Harper could have been asserting that he knew he would be unable to work due to his poor coping skills.  Unfortunately, it is impossible to know if the ALJ gave any consideration to this possibility, and therefore his credibility analysis was compromised.

Even if that statement were considered damaging to Harper's credibility, that statement alone does not alleviate the need for the ALJ to base his decisions on the entirety of Harper's medical record.  Significantly, the ALJ concluded that Harper's medically determinable impairments could reasonably cause his subjective complaints.  Tr. 29.  As the Third Circuit previously held, "[w]here medical evidence does support a claimant's [subjective complaints], the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason v. Shalala,* 994 F.2d 1058, 1067-68 (3d Cir. 1993).  An ALJ may, in certain circumstance, draw an adverse credibility determination based upon medication non-compliance and "conservative" treatment.  However, in light of the determination that the ALJ improperly rejected Dr. Cornell's medical opinion, the ALJ's assessment of the medical evidence cannot stand, and his credibility determination was not based in whole or in part upon contrary medical evidence.  *Id.* at 1068.

Furthermore, it is not entirely clear that Harper's medication non-compliance calls his credibility into question as suggested by the ALJ. "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Asture*, 564 F.3d 935, 945 (8th Cir. 2009) (internal quotations omitted, alterations in original).[3]

The record shows that Harper was diagnosed with schizoaffective disorder, bipolar disorder, depression and anxiety, all of which have persisted. Treatment records revealed that Harper complained of racing thoughts, mood liability and some visual hallucination. Tr. 372, 406-11. Similarly, he has consistently complained of non-commanding auditory hallucinations. The record shows that he mentions hearing possible voices at various doctor's appointments, and presented with a flat, blunted or reduced affect. (Tr. 376-78, 380-81). When viewed as a whole, nearly all of the evidence contained in the administrative record supports Harper's complaints.

---

[3] Additionally, Social Security Rulings mandate that, where an individual has not complied with medications, "a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable." SSR 82-59. The ALJ must first conclude that medication would be expected "to restore ability to engage in any SGA[.]" Id. If the ALJ finds that it would, he or she must then appropriately develop the record to ascertain whether "the claimant . . . is justifiably failing to undergo the treatment prescribed." Id. The ALJ did not do so in this case. Given Harper's statement that his medications "do not help[,]" it may well be that the medications would not restore Harper's ability to engage in substantially gainful activity. One remand then, the ALJ must develop the record and adequately address this issue.

Similarly, the ALJ's reasons for finding Harper's wife less than persuasive are improper.  With regard to Ms. Harper's third party statement and testimony, the ALJ stated that Michele Harper was not "medically trained to make exacting observations as to dates, frequencies, types and degree of medical signs and symptoms . . . the accuracy of the opinion is questionable." Tr. 29.   In addition to this, the ALJ state that "by virtue of the relationship as wife of the claimant, she cannot be considered a disinterested third party witness . . ." *Id.*   The ALJ concluded his assessment of Michele Harper's credibility by   stating that "significant weight cannot be given to her opinions because they were inconsistent with  the opinions and medical doctors in the case." *Id.*  These observations do not constitute a sufficient basis for discrediting Mrs. Harper's testimony and third party statement.

As previously noted, the ALJ's analysis of the relevant medical opinions and evidence was fundamentally flawed.   As a result, the ALJ's credibility determinations based upon purported inconsistencies with the medical evidence were compromised.  The ALJ's conclusion that the statements of Michele Harper were  contradicted by medical evidence cannot stand.

The remaining reasons provided by the ALJ to reject Ms. Harper's statement are also erroneous.   The Commissioner recognizes the relevance of third party

statements from individuals who know the claimant.   *See* 20 CFR§§ 416.912 and 416.913 and 416.929; SSR 96-7p and 96-8p.   Third party statements support a claimant's credibility and help assess the claimant's impairments, symptoms, limitations and functioning.   *Id.* Therefore, the ALJ may not reject a third party statement simply because the third party is not a medical professional.   Third party statements are usually submitted by individuals who are closest to the claimant. *See,* 20 C.F.R. § 416.913 (other sources include "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy.").   "If an ALJ could reject third part statements merely because that individual has some motivation to support the claimant's case, it would defeat the entire purpose of submitting third party statements and would run contrary to the Commissioner's express rulings."   *Maellaro v. Colvin*, No. 3:12-CV-01560, 2014 WL 2770717, at *12 (M.D. Pa. June 18, 2014)( Mariani, J.).   *See also,* SSR 96–7p ("the adjudicator must consider the entire case record, including ... information provided by ... other persons.")

While the ALJ's credibility determinations are ordinarily accorded deference, here the ALJ's determination lacked evidentiary support and was contrary to the Commissioner's regulations.   The medical record is consistent with Michele Harper's description of her husband's symptoms.   She testified that her

husband heard voices and was acting paranoid. She stated that it was a task to get her husband outside. Tr. 58. If there was anyone walking behind him, he would run across the street or "spaz out" if anyone got too close to him. She explained that by "spazzing out", Harper would become verbally aggressive and yell at people. *Id.* She indicated that, as a result, she only takes Harper outside in the early morning or late hours to help keep him calm. *Id.*

Her testimony is consistent with Dr. Cornell's assessment of Harper and the observations of other clinicians. The ALJ did not give legally sufficient reasons in support of his findings that Mrs. Harper's testimony was not entirely credible.

### c. Vocational Expert's Assessment

The final challenge is to the ALJ's hypothetical question posed to the vocational expert. Harper contends that the ALJ omitted the limitations assessed by Dr. Cornell. An ALJ's hypothetical question to a vocational expert must accurately reflect all of the claimant's individual impairments that are supported by the record. *See Chrupcala v. Heckler,* 829 F. 2d 1269, 1276 (3d Cir. 1987); *Podedworny v. Harris,* 745 F.2d 210, 218 ( 3d cir. 1984). As previously indicated, the ALJ's analysis of the relevant medical opinions and evidence was improper and as a result, rendered his hypothetical question inaccurate.

24

**IV. CONCLUSION**

A review of the administrative record reveals that the decision of the ALJ is not supported by substantial evidence.  Accordingly, the Court will not adopt the Report and Recommendation of the Magistrate Judge. The decision of the ALJ is vacated, and this case is remanded for further proceedings.  An appropriate Order will be entered.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge